All right, counsel, for appellants, first of all, introduce yourself, and then don't start the clock yet until we figure out the allocation of time, if you don't mind, thank you. Good morning, and may it please the Court, I'm Ben Nutley of Kendrick & Nutley, here representing the objector appellants. How are you sharing your 15 minutes? With me today, as you can see, is Scott Nelson, a public citizen, and we've decided to divide our 15 minutes, 8 minutes for me and 7 minutes for him. I'd like to, if I can, reserve 3 of mine for Roberta. We'll see how that goes. It's a risky business in this Court. Our questions sometimes make those wonderful plans go awry, but we'll try to accommodate you. I'll take my chances. Now, while that takes care of your side, could I ask, is it Mr. Kanazawa? Yes, Your Honor. What's the allocation? I understand you did send notes to us. Yes, we're going to divide it in half. All right. And Mr. Tallon and Mr. Senator, I understand you have a very elaborate allocation as well, including rebuttal and so forth. Actually, none. The allocation is zero, and I'm taking the 7 1⁄2 that Mr. Kanazawa is taking. Oh, all right. All right. Oh, very well. Very well. So that takes care of that. All right. Thank you very much, Counsel. We can start the clock now. Counsel, you can proceed. Thank you, Your Honor. We have been designated by the other appellants as well to make argument in this matter. My responsibility is to make argument on the issues of adequacy of representation and due process, as well as the attorney's fees awarded to the class counsel and the denial of attorney's fees to the objector's counsel. Before I begin, I'd like to ask if there are any questions or any issues that the Court is particularly interested in before I filibuster needlessly on some other issue. Well, on the adequacy of representation, why doesn't the existence of the two non-conflicted class representatives provide adequate representation for the class? The reason is that the two plaintiffs who did not sign on to the agreement, they started out without a conflict at the beginning. What happened then? They and their counsel didn't have the automatic conflict that would occur by signing off on this incentive agreement. On the other hand, did they then perform adequately over the course of the rest of the case? And the Court didn't really consider this at all, and I think that's what's important. It isn't that they're necessarily automatically for certain inadequate, but the Court didn't reach that issue to find whether or not they were adequate. And I would submit that there's good evidence and good argument that they weren't, because when this conflict arose, they at some point became aware of this agreement and either didn't understand or did understand but decided not to make the right choices, the adequate choices. The counsel and plaintiffs in that position ought to have taken. For example? Well, for example, if they became aware that the other plaintiffs had this conflict of interest, and increasingly it should have become apparent that this conflict of interest was causing a problem in garnering approval of the settlement and causing internecine fights between the plaintiff's counsel and among the plaintiffs, they should have done something. For example, as Judge Reel points out, the Court wasn't apprised of this agreement. The class wasn't apprised of this agreement. I think adequate counsel under the circumstances would be in a position of having to say to their co-counsel, who was the counsel who were actually appointed to represent the class, this is the McGuire-Woods firm, to say to them, look, we've got a problem here. We need to address. We need to tell the Court what's going on and come up with a solution that will retain and maintain the adequacy of representation. So I think, and what did they do instead of that? They pretty much got along by going along and went along with this arrangement, negotiated for their own clients, the non-signatory plaintiffs, if we will, a $25,000 request for an incentive award, and went along with it and didn't take the steps that adequate counsel and adequate plaintiffs might have taken at that time. The district court correctly, it seemed to me, analyzed all the factors that he missed and found that the settlement was fair, adequate, and reasonable. And wouldn't that show that they were adequate as the product of their settlement? Absolutely not. I think that's a really key issue here is can an adequate settlement render the inadequate representation or the allegedly inadequate representation adequate by its result? But your argument is that they were not conflicted at the beginning, and it was just during the course of the settlement negotiations that maybe their behavior wasn't up to the standards of adequate representation. And then in the end, there's a fair, adequate, and reasonable settlement. And the judge found that there was a fair, adequate, and reasonable settlement. Let's step back. Adequacy of representation is not just for an incentive award. You know, Judge Reel's opinion only talks about it in the conflicts of interest in connection with the incentive award. Nor is it just about the settlement. Adequacy of representation doesn't apply just to a settlement. There must be adequate representation at every stage of the case from start to finish. I mean, that goes as far back as Hansberry v. Lee. A 1940 case decided a couple years after Rule 23 was first promulgated, which said if there is an adequate representation, you don't have jurisdiction. The question isn't, well, is the settlement still okay? Did they do a good job on the settlement nonetheless? Or did their counsel do a good job? So you must stop right there and get jurisdiction by having an adequate plaintiff. Now, if you have a question about that, maybe what the right thing is. Kagan. I'm sorry. I'm missing something. What's the question, other than that they were – that they found out about the conflict and didn't squeal? What other evidence or contention or claim is there that the representation was inadequate? What more does there need to be? I don't think there does. Well, all right. But, I mean, that's it. You just keep talking about inadequate representation as if it's this big cosmic thing. I mean, it has to do, if I got it right, it has to do solely with the conflict and the unconflicted counsel's failure to disclose it in a timely way. Have I got that right? And also to do – there may have been other things that they could have done, other than that. The point is that the Court didn't really consider whether or not these signatory plaintiffs were or weren't conflicted. At best, it seems to have assumed that there was no conflict and that their representation was adequate. And that's not enough. The Court, especially when it's put at issue, has to, I think, make the determination, go that extra distance to take the portion of the opinion that talks about – and bear in mind, none of the plaintiffs was ever – all of the plaintiffs remain today as plaintiffs in the case, as representative plaintiffs. They were never – they should have been disqualified, according to Judge Reel's discussion in the incentive award section. Well, it is an odd opinion. I mean, it does separately discuss the incentive award and definitely frown on it. And then it doesn't discuss how that affects each of the other things specifically. But, you know, as a practical matter, when you get down to it, the problem with the incentive agreement was that there was an incentive to settle at least for $10 million, right? And then the settlement was $49 million. So this conflict didn't really result in some sort of prejudice to the class interest, because if there – if the conflict had been controlling the negotiations, they would have just stopped at $10 million. Not necessarily. And I see that I'm running out of time, and I don't want to step on my colleague's time. But the short answer is there was more to it than just saying that it stopped at $10 million, and why did they go forward? There was – and I think we've explained in our brief why that – not just the potential for the conflict there. Did it affect the case? We don't know. It appears Judge Reel thought that it did, that it affected the way the settlement went. And if that's true, then the very perception that it might have is bad enough. We have to go back and say, okay, let's get it straight so that this is definitely the perception isn't there, whether or not the reality is. And let me stop there. You're down to six and a half minutes, counsel. Counsel? We want to reset the clock here to 6.30. Okay. We do try to accommodate counsel, but sometimes this gets to be tricky. Go ahead, counsel, please. May it please the Court. I'm Scott Nelson. I represent the Robert Gaudet Group of Objectors, and I've also been designated to speak on behalf of other objectors' counsels who are challenging the court's determination that the settlement was fair and adequate. That determination was based on a fundamental legal error. As even the defendants in this case concede, a district court, considering the adequacy of the settlement, necessarily has to consider the question of the extent of damages that might be awarded. That's a quote from the defendant's brief at page 34. The district court here, however, expressly declined and held that he was legally disabled from considering the extent of the damages that might be awarded to the plaintiff class in this troubled damages antitrust case. That is to say, the district court, relying on the Second Circuit's decision, primarily on the Second Circuit's decision in City of Detroit v. Grinnell, said that in considering the fairness of an antitrust damages settlement, he could only weigh the class's recovery in the settlement against the actual damages that the class claimed, and not against the potential recovery of the settlement. Even if you were correct that the district court isn't precluded from considering federal damages, what difference did it make here, because it's just going to affect the percentages. I mean, that's all. Anybody who's ever tried an antitrust case knows that there's troubled damages at the end of the line. All the lawyers involved in this case are very sophisticated. Indeed, so is the class, for that matter. And so if you include troubled damages, well, it's just going to change what you think of as fair and reasonable. And here, even if you included it, you've still got a settlement range of, what is it, 2.3 times, up to, what, 9 times? Anyway, it's all still within a range of reasonableness. Well, it's within a range that potentially could be reasonable. But what the class is entitled to is to have the district court consider, based on all the circumstances of this case, whether that recovery is within the zone. What is there in this case that could possibly have led the district court to an evaluation that the settlement, aggregately, was not fair and reasonable, considering the plaintiff's experts analysis and the defense analysis of the potential damages discounted to present value, taking into account the risks of litigation and the expenses from then forward? Well, the district court in this case looked at those factors and said that they made a settlement in the range of 30 percent reasonable. That was his fundamental conclusion. But 30 percent of what? If he's limiting the balance. Well, it's still an uncertainty. All I'm trying to get you to address is why is that still not a fair percentage, even if you include in trouble? It's just a question of what percentage you can think is reasonable. And I can't imagine you're going to stand up there and tell me that any court ever has said that you need to have a 30 percent reasonable figure, including trouble damages. There's no percentage that is fair or adequate by definition, or inadequate by definition, in any case. But the district court here, who had the benefit of summary judgment briefing, which we can't see because it's under seal, and also had the benefit of the defendants and plaintiffs' expert reports, which also we can't see because they're under seal, he made the judgment that the likelihood of the class's success was such that he thought it was reasonable for them to get 30 percent. And the problem is he was looking at 30 percent only of a third of what they would actually receive if they were entitled to prevail. And, you know, it would have been very easy for the district court, if he thought it made no difference, to just say, as other district courts have done, particularly in the auction houses and compact disc cases that we cited, well, this Grinnell rule, I don't think it makes a lot of sense, but I come out the same way without it. There's nothing in this – in the district court's decision that hints that Grinnell was not an important and, in fact, decisive consideration in his mind as to the reason why this settlement was adequate. I wanted to say a couple of words. The consideration of treble damages also infected the judge's decision to uphold a cap in Cypre, which under this court's decision in Molsky, and even under the Second Amendment, would be quite improper. Now, it appears that under this settlement, the cap in Cypre may make no difference. But if the court were to remand, we would respectfully urge that it ought to give some guidance that, in the case of a future consideration or a possible future settlement, that having a Cypre award where there are identifiable class members who have uncompensated treble damages claims is not appropriate. But you are asking for remand on the attorneys' fees issue, are you not? The attorneys' fees is actually an issue that my co-counsel is asking for remand on. Right. The issues that we have raised relate to the fairness and adequacy and also to the court's acceptance of the sealing of the record, which, again, if you look at the opponents' briefs, they acknowledge that the district court did not make the findings appropriate to sustain this very broad sealing of all the merits filings as well. Can I ask you just a purely mechanical question? Sure. My understanding is that access was actually available and that a number of people, objectors and plaintiffs, took advantage of the opportunity and got access to both confidential and highly confidential documents, albeit to a certain extent redacted. Is that incorrect? That is not incorrect. And they objectors were offered access to some, but not all, of what they had requested. The offer that they were given did not include, for example, the critical damages reports. But the condition on the offer was that they accept the terms of the PEC report. Right. And that they would then have to file everything under seal and that all the other class members out there in the world. And so what was what's wrong with doing that? Well, part of the difficulty here is that the, number one, even leaving aside whether the parties can see documents, this sealing is not even appropriate as against the world at large, but number two. Well, yes. It's too late. I mean, nobody, or you didn't at least, raised that issue in a timely fashion. So, I mean, I'm no fan of sealed, you know, this record sealing thing, but it's not before us. Well, number one, I don't agree that it's not before you. The motion was made, and to say that it's not timely, it was made in this case before judgment. This Court has found in other cases that such motions are timely even after judgment. Now, granted, the reason that my clients wanted it would be greatly reduced if they didn't get it before the fairness hearing. But I don't think it's proper to say, or I should say, correct to say, that it's not before you or that it was not raised in a timely manner. But the second point is that, you know, letting a few people who asked for it see it while still keeping it secret from all the other objectors is sort of cutting a deal with one group of objectors to the exclusion of the rest of the class, which is something that in class action practice is by itself highly disputable. Roberts.  Roberts. Counsel, I think we understand your argument. Thank you, Your Honor. Your time, the time for your side has expired. Thank you. We'll hear from the other side. Please, the Court. I'm James Fallon. I represent Defendant Appley West Publishing. And I'm addressing the two arguments that Mr. Nelson just made having to do with the If 30 percent of single damages was a fair and adequate settlement, then 10 percent of treble damages was a fair and adequate settlement. The idea that a district court must expressly take into account what damages would be if trebled implies a false sense of precision. For one thing, it implies that there be a finding of liability after a trial in the exact amount that the plaintiff's expert articulated in his flawed report, that the defendants would be unsuccessful on their Daubert motion, and that the jury would entirely reject the expert report of the economist who opined for us and who was a great deal more credentialed and experienced than the plaintiff's expert. If you take all of that, then the suggestion to the district court was treble the damages, assume the plaintiff is right, and discount it by a probability factor, which is hardly science. This court's, this circuit's approach to assessing class action settlements contemplates taking account of a number of factors and surrounding the result that didn't occur because there was no trial. What was the reaction of the class? What was the reaction of counsel? And that's what Judge Riel did. He hardly committed an error of law by citing correctly the Grinnell decision, which has been on the books for 35 years and is not in conflict with any decisions of this court, including Molsky. So the district court did exercise his discretion. He went through all of the factors and came off the right place by looking at the plaintiff's expert reports, by looking at the defendant's expert reports, calculating the percentages, and in his discretion concluding that the amount of money, $49 million plus non-monetary relief, was a fair and adequate settlement. I want to turn quickly to the issue of the record in the court below. The difficulty I have with the argument that Mr. Nelson articulated is that to what end would there be anything to a remand or any other activity in the district court on this point? The court notice with respect to the settlement went out in March, late March of 07. There had been an earlier notice to the entire class in August of 06. This case was widely publicized. The class is made up of lawyers. It was a closely followed case. The district court got a month before the fairness hearing an improper motion from the district court to get access. We responded to that motion to say that it was improper as filed, and that's what the district court thought as well. We offered the Gaudet objectors, along with any other objectors who wanted to get access to the record, access to the record. In the time that was available, that was the right way to approach the issue. In the trenches, the way that issues like access to sealed documents get addressed is through a meet and confer process. But the Gaudet objectors took the position that they would take a purist or absolutist point of view, and they would not discuss with us a potential compromise or any compromise at all unless we agreed that everything in the record be posted to the Internet, which was in conflict with the legitimate confidentiality concerns of the defendants, as articulated to the district court. Moreover, not only did the district court have access to the entire file, particularly because the district court recused his law clerks from participation, and so the district judge personally reviewed all the filings in the case, and as much as his law clerks were potential or actual members of the class, the class counsel had access to the sealed records. One of the lead class lawyers switched sides and opposed the settlement. He knew all of the facts in the case and argued against the settlement. The class representatives themselves had access to the record, and objectors had access to the record. So the settlement was thoroughly and completely vetted by the district court based on an entirely thorough process, and there'd be no point to sending it back so that these four objectors would have the opportunity to make arguments that, in effect, have been made. I have nothing else unless the Court has questions. Thank you. Thank you, counsel. May it please the Court. My name is Sid Konitzow. I represent the class plaintiffs. I want to make four points. First, the best way to determine whether a class action settlement is fair, reasonable, and adequate is to ask the unnamed class members. Nearly 90,000 law firms and lawyers submitted claims to the claims administrator. Those claims account for something over 130,000 courses. In the overall class period of about 10 years, that constitutes about 35 percent of all of the potential class members. On the other side of the ledger are some regular objectors who have amassed 27 of the class members, and they constitute .007 percent, seven one-thousandths of a percent of the class. The second way in which to evaluate whether a class action is fair, reasonable, and adequate is to look at how this settlement was achieved. This is not one of those conditional classes that were created with an agreement with the defendant. Discovery was almost completed. We had gone through a very vigorous class certification motion. We'd gone through a very vigorous summary judgment motion, and we'd gone through multiple discovery disputes throughout this entire litigation before we entered into this case. We had one judge, Daniel Weinstein, retired, who helped us over several months to achieve this settlement. The final settlement agreement was really not achieved and put together until 11 days before this case was set to go to trial. This is not one of these cases that was settled early on with coupons. This was real money, and it was after a vigorous vetting by everybody involved. Third point. There's been a lot of discussion about the retainer agreements and the incentive clauses that were within the retainer agreements. This is a nonissue. It was completely transparent. All the retainer agreements were given to the defendants early on in the litigation, long before the class certification motion. What about the notice issue? Should that have been disclosed in the notice, the Rule 23 notice? Your Honor, let me explain why it wasn't. The defendants deposed all of the plaintiffs, and when they deposed all of the plaintiffs, they found that two of the plaintiffs did not have this incentive clause in their agreements. They were represented by separate law firms. There were two separate law firms that were involved and became co-counsel for the class. I didn't know anything else about that. Everybody else was going to get paid off, and they weren't going to get paid off. Well, the point is, all of this happened before class certification. Right. But it happened before notice, right? Before notice and everything. But let me explain what the significance of this is, is that not only did they ask the ones that had the incentive award, and all of them understood in deposition that they could ask for whatever incentive award they wanted, but it was the judge that would either grant or not grant whatever he thought was appropriate for the class representatives, and none of them had any expectation of any particular incentive award. And because of that deposition and the examination of this issue, the defendants in the class certification motion, which was very vigorously debated, and they tried to take it up on appeal and all that, they never even mentioned the retainer agreements in opposition to class certification. It was a nonissue. It was a nonissue then. It was a nonissue later. No one thought it was an issue because everybody understood that you can ask for determination as to whether... So why have the incentive agreement at all? I think that that was a mistake. And I think that the judge spent 10 pages in his opinion to make sure that nobody else does that. No. No question. It didn't have a true effect here. But I think what he was concerned about is, I don't want to see this kind of agreement again. And he wrote 10 pages to express that thought. But in reality, it didn't have an effect. In reality, it wasn't even significant enough for them to raise it in the opposition to the class certification motion. I want to make another point. There is a request here for attorney's fees for the, by one of the appellants because they say that they got this... Yes. Okay. Judge Breel writes 10 pages about this incentive fee matter. He cites to 20 authorities, law review articles, cases, statutes. There are only three cases that overlap the appellant's brief. Seventeen of those authorities are not in any of their briefs. This was not something, although they'd like to take credit for it, and they point to three sentences that look similar in the 10 pages. This is not something that I think they can take credit for because... Did Judge Breel actually rule on their entitlement to fees? Yes. And he denied fees expressly. Yes. And he said that, you know, this is not something that you raised. This is something that I thought of. And if you look at the authorities that he cites and the primary authorities that he relies on, none of the primary authorities that he relies on are in the defendant, the appellant's briefs. You know, he cites to these law review articles and various types of authorities and statutes, and he goes through a whole analysis of ethical rules and the like. And none of that is in the appellant's briefs. One of the parties, as I understand it, has raised the question as to the inherent conflict under California practice, which could result in a total bar of fees with respect to certain attorneys. Help me figure out what's how to analyze that. I'm not sure what the Court is talking about. Well, as I understand it, one of the counsels suggests that they've brought up the fact that there is an inherent conflict between certain categories. Oh, between different causes of action. We have a section 1, section 2, and section 7, and that perhaps there's a conflict in the classes and the like. One, I think that's something that they took out of briefs that were filed at one point in time regarding separation by Mr. Gissner to separate out one cause of action and all that. In reality, there was never a separation, and all of the causes of action were intact at the time that we settled the case. So there really wasn't any distinction between any of the classes involved here. Well, how can we be sure that Judge Reel took into account the potential of a conflict of interest among the attorneys representing the different categories with respect to the claim that they're making that there was a violation of California practice? Well, it's more of a – it never realized itself in this case because there was – we have other cases here. If I may, I don't think the question has to do with the section 6 issue. I think the question has to do with the incentive agreement. And if the incentive agreement – to the extent the incentive agreement created conflict, California law would preclude the recovery of attorneys' fees. Judge Reimer has articulated it much more carefully than I have. I appreciate her. Well, first of all, I think that there really wasn't any conflict because it was simply that there's something about you can request, and all of the parties – and the reason it never came up in even the class certification motion is that everyone understood that it really was one of those clauses that you have in there. It really means nothing because it's the judge that makes the decision about the incentive agreement. Well, the only concern I have here is how can we be sure that those issues were entertained by Judge Reel in his allocation of fees? That's all I care about. He spent 10 pages talking about this whole issue, and I think that he had that well in mind when he decided this whole thing. Well, we'll find it in the 10 pages, then, is what you're telling me. Yes. All right. Very well. And one last point that I wanted to make is that despite all the things that people say, and whether we talk about a four-part test or a nine-part test or an eight-part test about class actions resulting in settlement, the bottom line here is whether there was collusion or self-dealing. That's really the bottom line of what we're trying to do because we can't really negate the entire case. We're looking for indices as to whether there was collusion or self-dealing or whether there was independent judgment on the part of everybody, regardless of whether they agreed on what that independent judgment should be on behalf of the class. That's really what we're looking for. And I think in this case, even all the disputes that went on inside of the case with all the class representatives and everybody else, what it shows is, if nothing else, independent judgment. And all this class is made up of independent thinkers and independent law firms and everybody else. And I think that what it all shows is that there was no collusion. There was no self-dealing. There was nothing other than people trying to act in the best interest of the class. And the decision was not an abuse of discretion. Thank you, counsel. The case just argued will be submitted for decision. And the last case for argument this morning is Finance Express v. Nowcom Corporation.
judges: O'scannlain, Rymer, Wardlaw